COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Humphreys, AtLee and Raphael
Argued at Lexington, Virginia


DWAYNE ALLEN RAY, JR.

                                                    OPINION BY
v.        Record No. 0808-20-3          JUDGE RICHARD Y. ATLEE, JR.
                                                  FEBRUARY 1, 2022

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF RADFORD
Josiah T. Showalter, Jr., Judge

Naomi R. Huntington (Huntington, Huntington & Huntington,
on brief), for appellant.

Maureen E. Mshar, Assistant Attorney General (Mark R. Herring,[1]
Attorney General, on brief), for appellee.


Dwayne Allen Ray, Jr. appeals his conviction for distribution of a Schedule I or II

controlled substance, third or subsequent offense, in violation of Code § 18.2-248. He makes

two arguments on appeal. First, he argues that the trial court erred in denying his motion to

suppress the "out-of-court and in-court identifications of Ray by a confidential informant who

was shown a single photo of the defendant" prior to conducting a controlled buy. Second, he

argues that the evidence was not sufficient to support his conviction because the primary witness

was inherently incredible. For the following reasons, we disagree and affirm his conviction.

I. BACKGROUND

"On appeal, we review the evidence in the 'light most favorable' to the Commonwealth,

the prevailing party in the trial court." *Yerling v. Commonwealth*, 71 Va. App. 527, 530 (2020)

(quoting *Vasquez v. Commonwealth*, 291 Va. 232, 236 (2016)).

_____

[1] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

Ray was arrested for distribution of a Schedule I or II controlled substance after the police worked with a confidential informant to set up a controlled drug buy from Ray. Prior to his jury trial, Ray filed a motion to suppress the in-court and out-of-court identifications of Ray made by the confidential informant.

## A. *Motion to Suppress*

Detective Jimmy Smith of the Radford Police Department testified at the hearing on the motion to suppress. Smith named Jeremy Cumbee as the confidential informant involved in the controlled buy. He testified that Cumbee had agreed to become a confidential informant after being arrested in a similar controlled buy.

Smith explained that when he worked with an informant, he would ask the informant who they can "deal with, because whoever they are dealing with is usually the easiest and safest way to . . . work these investigations." Once the informant has provided the name, Smith conducts an investigation to confirm the identity of the person named. Once he has confirmed the identity, he shows the informant an "unnamed, unidentified photograph, just the face," and he asks the informant if that is the person they are going to purchase narcotics from.

Cumbee told Smith he could buy drugs from a man he knew as "Squirmy," whose real name he thought was Dwayne Wood. He also provided Smith with the location, though not the exact address, of Squirmy's residence. Smith discussed the case with another officer in his department, who was familiar with "Squirmy" and who provided Smith with the name Dwayne Ray. Smith then verified through the DMV that Ray lived at the address Cumbee had provided and obtained a photo of Ray from DMV records. Smith testified at the hearing that he had also searched "squirm" and "squirmy" on Ray's Facebook page, and he found a post where Ray said he might "change his name from Squirm to Snail emoji." He also testified that he had "watched [Cumbee] do previous buys in the past," and, in the buy where Cumbee was arrested, he watched

Cumbee enter Ray's residence. Cumbee then told Smith that Squirmy, *i.e.*, Ray, was his supplier.

On the day of the controlled buy, Smith showed the single, unmarked DMV photo of Ray to Cumbee, who confirmed that the man in the photo was Squirmy. Smith asked Cumbee to say "out loud three random letters" and then mark those letters on the photo to confirm he identified that specific photo. After identifying Ray in the photo, Cumbee entered the residence, which, according to Smith's investigation, belonged to Ray. Cumbee returned with cocaine and confirmed that the person who sold him the cocaine was the same person he had previously identified to the police as Squirmy.

At the hearing, Ray acknowledged that this was not "a traditional single-photo lineup because the crime happened after the identification took place." Nevertheless, he argued that the use of a single-photo lineup was unduly suggestive and that there was no evidence that the witness was so reliable as to outweigh the risk of misidentification.

The trial court denied the motion to suppress. It noted that the photo was not produced until Cumbee had already provided Smith with Ray's identifying information and Smith had verified the information. Furthermore, the trial court noted that both Cumbee and the police department "knew who the target was before the alleged incident occurred[.]" The trial court concluded that any question as to Cumbee's reliability was within the "purview of the jury."

B. *Jury Trial*

At trial, Cumbee testified that he had been arrested by police earlier in the summer and, as a result, agreed to become a confidential informant to earn consideration for his charge. As part of his cooperation agreement, he agreed to perform a controlled buy. Cumbee provided Detective Smith with the name of someone from whom he could purchase cocaine. Cumbee gave the name "Squirmy," whom he thought was actually named "Dwayne Woods," but later

learned was Dwayne Ray. Cumbee testified that he had known Ray for two or three years and that he saw him on a weekly basis during that time. He also described Ray as his "best friend."

On the morning of July 16, 2018, Cumbee called Ray and arranged to purchase cocaine from him. Cumbee then contacted Smith and informed him of the planned buy, and Smith drove to Cumbee's house to pick him up. Cumbee explained that Ray wanted to be paid partly with beer and cigarettes. Smith agreed to stop at a store on the way, and Cumbee used some of the buy money to purchase beer and cigarettes for Ray. Smith did not go into the store with Cumbee, but he inspected the beer and cigarettes to make sure they were unopened and that nothing was hidden in them. Smith also searched Cumbee "for any drugs or monies" before giving him the money for the drug buy. As described during the suppression hearing, Smith had Cumbee identify Ray from his unmarked DMV photograph.

Smith dropped Cumbee off at the "stage" area. He then drove around in his unmarked car and watched Cumbee as he entered Ray's residence. Cumbee was wired with audio recording equipment that allowed the police to record the interaction and listen to it in real time. He was also wired with a GPS tracker. Other officers were in the area in case back up was needed. The transaction took about thirty seconds, and Cumbee testified he was inside the house "maybe a minute." After the buy, Cumbee walked back to where he was supposed to meet Smith. He gave Smith the cocaine that he had purchased from Ray, and he confirmed that Ray was the person from whom he purchased drugs.

During his testimony, Smith acknowledged that Cumbee did not comply with all the terms of his cooperation agreement. He acknowledged that Cumbee violated multiple terms, including getting new criminal charges, failing to check in, and failing to attend a court date. He noted, however, that Cumbee was lucid and alert on the day of the buy.

Cumbee admitted he agreed to cooperate because he "didn't want to do any more time." He also admitted that he did not comply with the terms of the agreement and that he had multiple prior felony convictions.

After the Commonwealth finished presenting its case,[2] Ray moved to strike the evidence. He argued,

> Your Honor, I would move to strike, as the Court knows that identifying is a crucial element of the offense; and it's our position that the Commonwealth at this point in time has relied on an old DMV transcript and the word of an impeached witness, a multiple-time convicted felon, in order to demonstrate the identification of the person who committed this crime. In light of that, we would ask that the Court find that there has not been a *prima facie* case presented to the, to the Court.

The trial court denied the motion to strike.

Ray then presented evidence on his own behalf. His fiancée testified that she and Ray moved out of the home in question on June 4, 2018 and that they lived in a hotel until they found a permanent place to live. She acknowledged that they continued to pay utility bills for the home for several months, but claimed they were disputing those payments. She also admitted she did not know where Ray was on the morning of the buy. Ray renewed his motion to strike, stating "the arguments I made previously remain the same." He also mentioned that the trial court should strike the evidence because it had additional evidence of where Ray may have been living.

---

[2] The Commonwealth also presented evidence from other individuals, each of whom testified that they were familiar with Ray and that he used the nickname "Squirmy." Two witnesses testified about their Facebook interactions with Ray, in which the nickname "Squirmy" was used.

The trial court denied the renewed motion. It concluded that the case turned on the credibility of witnesses, which was a matter for the jury as the factfinder. The jury found Ray guilty of distribution, third or subsequent offense. Ray now appeals to this Court.

II. ANALYSIS

A. *Motion to Suppress*

Ray argues on appeal, as he did in the trial court, that the out-of-court identification of Ray should have been suppressed because it resulted from an "impermissibly suggestive single photo display" shown to the confidential informant prior to the controlled buy. He contends that the out-of-court identification using the single photo display tainted the later in-court identification, which should likewise be suppressed. We disagree.

1. Standard of Review

When reviewing the denial of a motion to suppress, "we view the evidence in the light most favorable to the Commonwealth." *Jones v. Commonwealth*, 71 Va. App. 375, 380 (2019) (quoting *Carlson v. Commonwealth*, 69 Va. App. 749, 757 (2019)). "Our review includes 'evidence adduced at both the trial and the suppression hearing.'" *Carlson*, 69 Va. App. at 758 (quoting *Greene v. Commonwealth*, 17 Va. App. 606, 608 (1994)). "We give deference to the trial court's factual findings and review *de novo* the application of law to those facts." *Joyce v. Commonwealth*, 72 Va. App. 9, 14 (2020) (quoting *Carlson*, 69 Va. App. at 758). Ray has the burden to show that the denial of his motion to suppress was reversible error. *Commonwealth v. Robertson*, 275 Va. 559, 564 (2008).

2. Out-of-Court Identification

We turn first to Cumbee's out-of-court identification of Ray prior to the controlled drug buy. Quoting *Curtis v. Commonwealth*, 11 Va. App. 28, 31 (1990), Ray argues that the use of a single photo display is "one of the most suggestive methods of identification." He asks this

Court to apply the two-part test for eyewitness identifications outlined in *Neil v. Biggers*, 409 U.S. 188 (1972).

In *Biggers*, the United States Supreme Court established the criteria to evaluate the admissibility of an out-of-court identification. "Evidence of an out-of-court identification is admissible at trial if either '(a) the identification was not unduly suggestive, or (b) the procedure was unduly suggestive, but the identification is nevertheless so reliable . . . that there is no substantial likelihood of misidentification.'" *Logan v. Commonwealth*, 51 Va. App. 111, 115 (2008) (quoting *Hill v. Commonwealth*, 2 Va. App. 683, 693 (1986)).

But Ray's argument ignores the rather unique facts of this case. "The Supreme Court of the United States in *Biggers* . . . envisioned a predicate factual scenario that is perhaps so obvious that it was hardly discussed in any of the cases." *Id.* "That scenario is one in which police are attempting to *confirm* the identity of a *suspect to a specific crime*." *Id.* (second emphasis added). In cases such as *Biggers*, the *crime has already occurred*, and law enforcement officers use an array of techniques (such as photo identifications, one-on-one showups, and lineups) to have the "witnesses *to that particular crime* . . . observe a group of individuals in person, or in a photo," with the ultimate purpose of "confirm[ing] that the suspect is the perpetrator of the crime." *Id.*; *see, e.g.*, *Perry v. New Hampshire*, 565 U.S. 228, 234 (2012) (identifying the defendant both in person and via photo array after the break-in had occurred); *Manson v. Brathwaite*, 432 U.S. 98, 101 (1977) (identifying the defendant from a single photograph after a controlled buy); *Scott v. Commonwealth*, 68 Va. App. 452, 456 (2018) (identifying the defendant by a show-up identification after the robbery had occurred); *Curtis*, 11 Va. App. at 30 (identifying the defendant as the perpetrator after being shot).

Furthermore, in the factual scenario envisioned by *Biggers*, witnesses to a crime "must ordinarily 'testify about an encounter with a total stranger under circumstances of emergency or

emotional stress.'" *Logan*, 51 Va. App. at 115-16 (quoting *Manson*, 432 U.S. at 112). It is these circumstances, combined with unduly suggestive police procedures, that give rise to the risk of misidentification, which in turn implicates the protections of the due process clause. *See Perry*, 565 U.S. at 233; *Logan*, 51 Va. App. at 116.

By contrast, here, when Cumbee identified Ray from a single photo, *no crime had occurred*.[3] Cumbee was not, at that point in time, a witness to a crime. Nor did he identify Ray as the perpetrator of a crime that had been committed. He was not making the identification "under circumstances of emergency or emotional stress." *Logan*, 51 Va. App. at 115-16. Instead, Cumbee identified Ray to the police *prior* to any crime being committed. In fact, it was Cumbee that suggested Ray to the police as a potential target for the controlled drug buy, and Cumbee testified that he had known Ray for two or three years and saw him on a weekly basis. Rather than trying to identify the perpetrator of the crime, the police were only seeking to confirm the identity of the person Cumbee suggested as a target for the controlled buy.[4]

---

[3] In his argument on brief, Ray focused on the pre-crime single-photo identification, arguing it was unduly suggestive. During oral argument, Ray conceded that the pre-crime identification was reliable, but nevertheless argues that it tainted the second identification after the crime, when Cumbee confirmed that the person he purchased drugs from was the person in the photograph he was shown prior to the controlled buy. We fail to see how a concededly reliable identification could taint a subsequent identification. The same factors that Ray concedes made the first identification reliable, namely that Cumbee had known Ray for years and thought of Ray as his "best friend," would likewise make the subsequent identification reliable.

[4] Furthermore, "[a] primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place." *Perry*, 565 U.S. at 241. "This deterrence rationale is inapposite in cases . . . in which the police engaged in no improper conduct." *Id.* at 242. The police in this case did everything one could hope to avoid mistakes. After Cumbee suggested "Squirmy" and provided a location, police did a thorough investigation to verify the information Cumbee provided. Thus, the deterrence rationale of excluding the identification is not present in this case.

Therefore, the factual scenario contemplated by *Biggers* and its progeny is not present in this case.

"Only when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice,' have we imposed a constraint tied to the Due Process Clause." *Perry*, 565 U.S. at 237 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). The due process clause applies as a check on eyewitness identifications where "the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Id.* at 232. But the "word 'identification' need not set off the constitutional fire bell." *State v. Greene*, 201 A.3d 43, 45 (Md. Ct. Spec. App. 2019), *aff'd*, 229 A.3d 183 (Md. 2020). Where, as here, the identification occurred before any crime had occurred, and where the concerns giving rise to due process protections do not exist, the due process clause does not apply. *See Perry*, 565 U.S. at 245 ("The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness."). Accordingly, the trial court did not err in denying Ray's motion to suppress the out-of-court identification.

### 3. In-Court Identification

Because we conclude that the trial court did not err in admitting the out-of-court identification, we also conclude that the admission of the in-court identifications was not error. *See Logan*, 51 Va. App. at 117.

### B. *Sufficiency of the Evidence*

On appeal, Ray argues that the evidence was insufficient to convict him because the "primary witness against [him] was so inherently incredible that his testimony was unworthy of belief, and the Commonwealth failed to exclude reasonable theories of [his] innocence." He contends that Cumbee's testimony was inherently incredible because Cumbee "violated the

cooperation agreement designed by the Commonwealth to ensure his trustworthiness." The Commonwealth asserts that Ray did not preserve this argument on appeal. We agree.

Rule 5A:18 requires that an "objection [be] stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Pursuant to the rule, "a specific argument must be made to the trial court at the appropriate time, or the allegation of error will not be considered on appeal." *Edwards v. Commonwealth*, 41 Va. App. 752, 760 (2003) (*en banc*). "[M]aking one specific argument on an issue does not preserve a separate legal point on the same issue for [appellate] review." *Hicks v. Commonwealth*, 71 Va. App. 255, 266 (2019) (second alteration in original) (quoting *Johnson v. Commonwealth*, 58 Va. App. 625, 637 (2011)).

In his argument to the trial court, Ray did not argue that Cumbee failed to abide by the terms of the cooperation agreement or that his failure to do so rendered his testimony inherently incredible as a matter of law. Instead, he argued that the evidence identifying Ray was insufficient because the Commonwealth "relied on an old DMV transcript and the word of an impeached witness." But the mere fact that a witness' testimony may have been impeached does not necessarily render the testimony inherently incredible. *See Juniper v. Commonwealth*, 271 Va. 362, 415 (2006) (noting that inconsistencies in testimony do not necessarily render the testimony unworthy of belief and are "appropriately weighed as part of the entire issue of witness credibility, which is left to the jury to determine"). Thus, pointing out that Cumbee's testimony had been impeached is not the same as arguing that the testimony was inherently incredible as a matter of law such that it was "unworthy of belief or that the jury should not be permitted to weigh [Cumbee's] credibility." *Commonwealth v. Bass*, 292 Va. 19, 33 (2016) (finding that defendant did not preserve his argument where he did not argue to the trial court that the witnesses' testimony was inherently incredible as a matter of law). Accordingly, Ray

did not properly preserve the issue of whether Cumbee's testimony was inherently incredible, and we will not consider it on appeal.

Ray also argues that the evidence was insufficient because Cumbee was "unsupervised" by law enforcement at multiple times throughout the controlled buy and because he "provided evidence that he was no longer living in the home where the transaction supposedly took place."

When reviewing the sufficiency of the evidence, we view the facts "in the light most favorable to the Commonwealth, the prevailing party at trial." *Fletcher v. Commonwealth*, 72 Va. App. 493, 501 (2020) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). This standard requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn [from that evidence]." *Bagley v. Commonwealth*, 73 Va. App. 1, 26 (2021) (alteration in original) (quoting *Cooper v. Commonwealth*, 54 Va. App. 558, 562 (2009)).

Here, the evidence is sufficient to prove that Cumbee purchased cocaine from Ray. Prior to the controlled buy, Cumbee was searched to ensure he did not have drugs and only the buy money on his person. Detective Smith also searched the beer and cigarettes purchased for Ray to ensure that nothing was hidden in them. Cumbee was wired with an audio recording device, allowing police to listen in on Cumbee in real time. He was also wired with a GPS tracker so he could be located even when police could not physically see him. Detective Smith testified that he watched Ray walk to and enter the home. Cumbee was only inside the home "maybe a minute." When he left, he went immediately to the location where he was supposed to meet Smith and handed over the cocaine purchased. Cumbee identified Ray as the person from whom he purchased cocaine. While the police may not have had eyes on Cumbee the entire time, the evidence is sufficient to support a reasonable factfinder in concluding that Cumbee obtained the

- 11 -

drugs from Ray. *See Jones v. Commonwealth*, 21 Va. App. 435, 444 (1995) (holding that the fact that police did not have the informant under surveillance the entire time he was away from them did not establish a hypothesis of innocence where the circumstantial evidence established the informant obtained drugs from the defendant).

Finally, Ray contends the Commonwealth failed to exclude reasonable theories of innocence because he "provided evidence that he was no longer living in the home where the transaction supposedly took place." But "[m]erely because [a] defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded. What weight should be given evidence is a matter for the [factfinder] to decide." *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017) (alterations in original) (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)). "By finding [a] defendant guilty, therefore, the factfinder 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'" *Id.* (alteration in original) (quoting *Haskins*, 44 Va. App. at 9).

Here, the evidence was such that the jury could permissibly reject Ray's evidence that he no longer lived in the home. It was the role of the jury to hear the testimony of Ray's fiancée and determine what weight, if any, to give that testimony. *See Rams v. Commonwealth*, 70 Va. App. 12, 26-27 (2019) ("The fact finder, who has the opportunity to see and hear the witnesses, has the sole responsibility to determine their credibility, the weight to be given their testimony, and the inferences to be drawn from proven facts." (quoting *Hamilton v. Commonwealth*, 279 Va. 94, 105 (2010))). And even if the jury accepted Ray's evidence as true, that does not disprove Cumbee's testimony that he purchased cocaine from Ray at the home. The evidence indicated that Ray and his fiancée continued to pay bills at the home, and Ray's witnesses admitted on cross-examination that they did not know where he was on the morning of

the controlled buy. Thus, the evidence was sufficient to support the jury's rejection of Ray's hypothesis of innocence and to support his conviction for distribution of a Schedule I or II substance.

## III. CONCLUSION

Because the identification of Ray occurred prior to a crime being committed, due process does not require its suppression, and the trial court did not err in denying the motion to suppress. Because the identification was properly admitted and the evidence was sufficient to support Ray's conviction, we affirm.

*Affirmed*.